Mr. Smith. Thank you, Your Honors. The Ecclesiastical Court, my name is Andrew Smith, and I represent Perry v. Rosetto in this case. I will address the issues in reverse order today, beginning with the second issue, which involves whether officers forced Perry to confess against his will. For over 20 hours, Perry refused to make a confession, but this changed at one moment. That moment was when officers threatened his elderly mother with arrest if she did not confess, and told her to tell Perry that she was being threatened with arrest. Such police behavior violates U.S. Supreme Court case law and Illinois case law, and for these reasons, Perry's confessions must be suppressed. The ultimate test for voluntariness is whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort. The facts here show that Perry's will was overcome. Upon hearing that his mother would be arrested and potentially charged with Perry's crimes, Perry confessed. The officers here knew Perry's word about his mother. Over two days, he asked to call his mother ten times, growing more and more animated and concerned as time passed. Recognizing this, the officers here exploited Perry's concern for his mother. They allowed Perry to call his mother, but as Perry's mother prepared to speak to her son, officers in her house, who were searching the house, threatened to arrest her if Perry did not cooperate, and they instructed her to tell this to Perry. The Illinois Supreme Court has stated that the use of threats to elicit a confession is improper, and people would be guilty. And people would be strong, a appellate court decision. The court suppressed a confession where the officers threatened to arrest the defendant's girlfriend and send his children to DCFS. The U.S. Supreme Court has also found that the threat of losing one's job is enough to suppress a confession, and that case is from Beardy v. New Jersey. Here, Perry was held for 27 hours. He was held for 13 hours in interrogation over two days. He was placed in solitary confinement at night, denied ten requests to his elderly mother, promised leniency multiple times, but this still did not get him to confess. So the officers went after the person that he seemed to care about, and that was his mother, and they threatened his mother, and right after that, he confesses to the crime. U.S. Supreme Court has stated that we live in an accusatorial, not an inquisitorial, system. We live in a system in which the state must establish guilt by evidence independently and may not by coercion prove its charge against an accused out of its own mouth. A lot of the things that he talks about that were coercive and that they were going to arrest us and all that stuff that happened was when he told them to turn the videotape off. So the videotaping this, but the egregious conduct that he alleges happens after he says, hey, turn that videotape off. I think we need to focus on what the actual threat here is. Perry does say that an officer in the room with him, Timothy Moore, threatened to haul his mother downtown to jail if not at her house, and that she testified to on the stand. She testified that when officers were searching her house, they threatened to arrest her if she could not get her son to cooperate, and it's that threat that then resulted in his confession. No one rebutted that. Melody Hudson testified that she was threatened, and Perry testified that his mother told him over the phone that he was threatened. I thought that one of the policemen in the house who was charging his mother actually said that they said that. Right, and none of those officers testified to rebut this threat. So the only thing we can assume is that the reason no one rebutted this is because it's true that they did threaten to arrest her if they could not get her son to cooperate. Turning to the second issue, the U.S. Supreme Court in Florida v. California stated that the record must establish that the defendant, when going pro se, has his eyes wide open. Perry's eyes were not wide open in this case. A year before going pro se, although the correct maximum he could receive was 45 years in prison. He was then sentenced to 87 years in prison, 42 years over the maximum that he was told. This has been found to be prejudicial and not substantial compliance by multiple reviewing courts, including people v. Barrs, people v. Koch, and people v. LaFleur. The state does not claim that the admonishments given when Perry actually proceeded pro se were sufficient. So he proceeded pro se, the moment he proceeded pro se, he actually went pro se. He was never told what the maximum sentence was. And the state does not claim that those are, is substantial compliance. The state claims that there is substantial compliance here because of admonishments given a year earlier that were mangled and that did not convey to Perry Grisello that the maximum he could receive was 90. In fact, the judge explicitly tells him the maximum he could receive is 45 years. So, and the Supreme Court has suggested that a seven month delay in receiving the admonishments is not substantial compliance. Here we've got a year long delay. In people v. Rees, the Supreme Court stated a test for deciding when is there, when there's not early compliance but the admonishments are good enough for there to be substantial compliance such that the defendant's right to not prejudice. And that test is in people v. Rees and the court said whether the admonishments could have affected the defendant's decision. These admonishments plainly would have, could have affected Perry Grisello's decision. This is the difference between a de facto life sentence, getting out at 87 years old and getting out at 65 years old. Hearing that life sentence could focus his mind and get him to think about do I really want to do this or not. He vacillated back and forth throughout before trial, unsure of whether he wanted to go pro se or not. Hearing the true admonishments that would be life could have focused his mind and we cannot say that he would not have changed his mind based on that. If the court has any questions then we ask that the objection be suppressed and for the first issue that is a case to be met for a new trial so that he can be properly admonished as part of the process. Thank you. Thank you Mr. Skidmore. Mr. Hennedy. May it please the court, counsel. If the court will go to my brief in page 11, you will notice that after the first paragraph there is a footnote on the left. I don't know if your brief shows a footnote or not but mine doesn't. Somewhere in the translation, somewhere in the translation is where my copy and the one that my secretary signed off the file. The footnote didn't appear. I will tell the court what the footnote is about. It's simply a road map as to how I cited to the different disks that are there, the videotapes. What I will do is I will take and file a letter or a motion wanting to amend my brief and I'll have this attached to the court's convenience. But that's okay with the court. Did you discuss it with counsel? No, I haven't. I will take and do that afterwards. I'll make sure counsel gives a copy to me. But it's like I said, it's just a road map that addresses how I cited things. Is there any response you'd like to make to that, Mr. Smith? He's just talking about how your road map was cited. If that's true, then... And the other thing is, at this point, at the personal paragraph of the filing, the last sentence where I sort of establish that the defendant's mother was not directly arrested, I have the wrong citation there. That should be a volume 14, an RP 14 at R11. Sounds like you need a new secretary. Sounds like I need to take and basically keep my fingers in control a little bit when I start typing these things. Thank you for that. With respect to the second issue, the involuntary arrest of the professional, the defendant hones in on what I say allegedly someone said in the house to the defendant's mom. He claims that when the mom told the defendant that I had been threatened to be arrested, that made the defendant confess. What the defendant doesn't argue is what happened before that. The reason I say that is because his impetus for confessing is not the fact that his mom was threatened. The impetus for him confessing was the fact that it was his own design. Throughout this 20 hours or whatever, the trial judge basically defined it. He reviewed all of it. The trial judge said there was not one iota of any kind of evidence here of any kind of coercion or coercive environment. And what happened is, prior to that phone call, as is pointed out, the defendant shut the tape off. So we really don't know what went on. We do know what went on in the testimony, but not the video report. And what we have is, we have testimony that I would say is unconvicted. In that, the defendant kept saying throughout, when we started looking at this, all the way through, almost from the beginning, I want a deal. I want a deal. You want me to talk? I want a deal. I'm not talking until I get a deal. I want a deal. And he kept using that. He kept going, get the state's attorney down here. I'll make a deal. I'll tell you anything you want to know. I want a deal. And at least in my view of the record, what he was trying to do is, at that point, he was trying to take a limit. Because he said, I don't want to take a complete guilty deal. I'm in possession of a stolen material. That's it. I have nothing else to do with this. Give me that deal, and I'll tell you what everybody's participation is in it. And he goes on for hours like this. Eventually, what happens when he's off the video, what eventually happens is, he's doing the same song and dance. Finally, police say, that's it. We're done. We are out of here. Because you're just doing the same thing we tell you. And even the assistant state's attorney, on the video tells it. Jodi Coos, who was the first assistant. She said, I'm not going to take a guilty deal before I know what kind of information I've got to deal with. It's just not going to happen. If you cooperate with us, and your cooperation is beneficial, you'll be taken into consideration. But we can't take a not going to take a guilty deal. Same thing. They go off the tape. And when the police finally say, we're done with this. We're finished. We are out of here. Your friend says, well, wait a second. Wait a second. Time out. If you let me call my mom, I will take and tell you anything you want to know. I'll tell her, will you be truthful? Yes, I will be truthful, and I will tell you everything. Just let me call my mom. So the police basically get him to take, or the police testify, that they made sure that he's not being coerced into doing this, in the sense that they could proclaim, it's not you confessed to doing this, but this didn't come from us. What we can do is this came from you. He said, yes. And so basically, that is the interest of his confession, not whatever his mom allegedly told him about supposedly being arrested by some other officer in the house. So the confession here is voluntary. We have a 47-year-old individual who's been through the system, who has no doubt in the system, who knows what to do, who came in and basically was trying to take and choreograph a deal, trying to take and control what was going on here, and trying to take and give himself the best deal he could for none of the holding bases, dinner boundaries. Just think of this. It's unlawful possession of stolen goods. That's all he wanted to do. That's what he wanted to do up front. Before anything else came out, before anything else could happen, he wanted that kind of deal. And so under the circumstances, this is not the naive kind of defendant, and the case the defendant cited as additional authority that this court granted that I did not respond to really speaks in large terms with respect to his issue here and his business about the phone call and not being allowed to call the mom. The lack of a phone call, first of all, as the cases that I cited, Williams and I think Williams and this court, as I'm gladdened, basically Section 103 is not involved here. The right to make a phone call, that is basically to take a reach out on the outside to be able to arrange bail and to be able to take and get counsel. The defendant was warned four times, and four times he raised his right to counsel. It wasn't a situation where he had to try to get somebody outside. He wasn't naive. And so the case that the defendant cited as authority is perfect because in that case, it wasn't just the fact that the defendant was deprived of the ability to call somebody, but it was also the fact that there were other aspects, other things that were done, threats that were done, other things that are also factored into the determination of voluntary confession. It just wasn't the one factor. There were four or five other factors involved in that case that led the court to say that this confession was involuntary. But if you look at the cases where the only issue raised is the lack of a phone call, which is Williams and this court's green decision, then basically you find out that that factor alone is not sufficient to establish an involuntary confession. You look at the totality of the circumstances, and when you review the tapes and you look at what was going on and how things happened in this case, you will take to see that this defendant's confession was voluntary, not the result of the fact that his mom was sent to be arrested, but because of the fact that the defendant said, let me call my mom, I will take and tell you everything you want to know. That decision was made before he even spoke to his mom. And so as a result, we think that the trial judge properly assessed the credibility of the evidence, of what the defendant was saying, of how everything that all of a sudden seemed to happen while the tape was off, none of this happened while the tape was on, and how he discredited the defendant's evidence. And in this case, we don't state, he's not delaying that the defendant has overcome that finding of fact, and as a result, the defendant's confession is voluntary, and the trial judge properly denied the defendant's motion to suppress. With respect to the second issue. Substantial compliance. In this issue, with respect to waiver of counsel, Rule 401, this issue was not raised at all in the trial court. And so, the general proposition was forfeiture. There's also plain error. In this particular case, the only way for the court to provide the defendant with this new trial, new Rule 401, new punishments, and all this, is for the court to apply plain error and to supply the remedy the defendant is asking for. In this case, though, before plain error is applied, before plain error is applied to any case, my understanding of plain error is, before you determine whether or not it's a closely balanced evidence case, or whether it is error that's so affectionate to the judicial system that regardless of the prejudice, regardless of the weight of the evidence, it needs correction, before you do all of that, the first thing you have to determine is what? The first thing you have to determine is, is there error? Now, in saying that, what do we do? We actually do assess the question. We assess whether or not what's happened here is error. So we subsequently address the issue to determine whether or not plain error will apply in order to provide the remedy. Okay? Well, in this case, what I tried to take and argue, and I can see maybe there was any confusion from my read from the defendant's reply brief, is the fact that what I'm trying to say is that there is no error here. There is no error in this first issue, because either the rule is complied with strictly, which is not required, it's only substantially compliant, but at the very least, there is substantial compliance. In this case, what was the defendant told? Okay? Now, mind you, I will admit, the trial judge made a comment about the offenses, but he asked the state to tell him what the sentencing rate would be. Rather than the judge say that, he had the prosecutor say something. The defendant was told that based on the offenses that he had, he was charged with two counts of armed robbery, a count of home invasion, a count of burglary, and two counts of aggravated unlawful restraint. He was told that the home invasion and armed robberies were Class X sentences that carried a range of six to 30. The residential burglary was Class I, range four to 15, with the aggravated unlawful restraints, Class III to 35, of their probation. In addition at that time, he said there was also the TAP, the add-on. There was a potential 15-year add-on, so that basically, it would go to 21 to 45. Thank you. And so, he then said, with respect to back up, in this case, besides this set of charges that the defendant was facing, there was a separate set of charges the defendant was facing. He said as far as those were concerned, depending on how much of the trial he would find, those two separate things might be consecutive. But here he pointed out that in this case, the home invasion and armed robberies carried the potential of consecutive sentencing. Didn't tell him 90 years. The flaw in the defendant's argument is to say that he was sentenced to 90 years. No. He was not sentenced to 90 years or 87 years or whatever. He was sentenced to 43 years on one and 44 on the other to be served consecutively. He was informed of, as counsel correctly pointed out and corrected me, the rule does not say anything about it has to come in a sentence. It has to come in the potential penalty. The defendant was informed of the potential penalty. The penalty was the years, the minimum and maximum years for those offenses that could be served consecutively. Did not have to take and do the math and say it might be 40, it might be up to 90 years maximum. It don't have to do the math. The case that the defendant cites, we agreed to say that, the receipt, coke and all that, those were situations where the trial judge didn't say anything about consecutive sentencing. And if you read the cases, the cases only required the trial judge to mention the fact that consecutive sentencing is possible. Do not have to do the math. And that is crucial because consecutive sentencing, as the case law provides, are discrete sentences. They are separate, individual unto themselves. The manner in which they are served does not make them a single sentence, a single offense or a single penalty. The penalties are separate. How they are served is just an adjunct to that. So in this case, the defendant was properly monitored. And the fact that there was this year in between the cases that the defendant cites, all three of those cases are cases where they said the time lapse was detrimental because at the time he was admonished, he wasn't being admonished about his right to waive counsel. It was basically preliminary hearing. And so basically what they're saying is you're not going to be paying attention with the penalty of preliminary hearing. But if you're waiving counsel, you're going to be paying attention to what the specifics are and so on. Thank you. If there are any questions, I'll be happy to respond. Mr. Smith and your rebuttal. The state says that he was told the penalty. That's just not true. You have to be told the penalty which includes consecutive sentences. If he's saying 45 and not saying that he could get consecutive sentences, he's not being told the full penalty. It's just not there. I cited to the record, you can see it. The judge asks, is this subject, is this case, is other cases subject to consecutive sentences with regard to other cases? The state says, yeah, he could get consecutive for other cases, but internally he could. The judge then negates any knowledge Perry would have gotten by saying that in turn there could have been consecutive sentences by telling him that the majority, the maximum sentence is 45 years. So he was told the maximum he can get is 45 years. I don't understand where he's being told that the maximum is 90. He was never told he could get consecutive by the judge and the judge is the one who must tell this. When the judge enables the state's admonishments and tells him the maximum he can get is 45, that's plainly not compliance with the rule. With regard to plain error, this is classic structural error. The state would like to have the burden on the defendant to object to a right that he does not even know he has. The second issue is called this burden Kafka-esque. It is a structural error. It's a fundamental error. It involves his right to counsel. This is classic second-pronged plain error. With regards to the second issue, I do object to the state changing the site in its brief because it's saying it's changing. That sentence said it was established that the mother was not threatened with arrest. And he cites to a wrong site. That is the crux of the case here. He's saying a wrong site. I now don't know what he's citing to. My reading of the record, and unless you have something disputed, is that while the officers were searching the mother's home, they threatened to arrest her if she, while on the phone with Perry, could not get him to confess. And they told her to tell this to Perry. No officer from that scene testified to her but that. The only conclusion that could be brought is that that actually occurred. So the question... Didn't they find contraband in the house where she was living? Didn't they find goods that had been stolen from a house? Yes. So couldn't she be arrested for that? There's a doctrine that if there's probable cause, yes. She's in possession of stolen goods. You can't stretch that doctrine to just threaten anybody that has a possible relation to the crime and threaten them for arrest. Wasn't it for the trial judge to decide whether these allegations was credible? I struggle a little bit with whether the defendant was so concerned about his mother's well-being or concerned about having his mother do something with the stolen items that were in the house. I mean, I know he wanted to contact her, but the trial judge saw everybody, heard everybody, and determined that the defendant or the mother's version was not credible. The judge did not determine that. The judge didn't even talk about the threat. It was just completely ignored. So, I mean, it was just... Then perhaps it's more accurate to say the judge was not persuaded by that evidence. Well, if that was rebutting what the mother and the defendant said, I mean, what's his basis for disbelieving it? It would just be his own thoughts about... He has to have some basis to disbelieve the undisputed fact. Well, I think he said that it was choreographed and the video was turned off for a reason. Well, on that point, I understand that there looks to be this dance going on between Perry and the officers, but Perry's not a sophisticated person. He didn't graduate from high school. There is some suggestion that he might not be so intelligent, and he is in a room with two officers, trained in interrogation, and they know how to get people to confess. And if you watch the video, Perry's saying, I don't want to confess. I'm not talking about this. And they keep saying, you can get leniency. You can get leniency if you confess. And he says, if I get leniency, what can I get in return? So the suggestion that this is a deal keeps being brought by the officers. The idea that Perry is choreographing an interrogation I think is pretty far-fetched. These are trained interrogators. They know what they're doing. He does not. And on that point, despite all the tactics used by the police, Perry refused to confess. And it was only when he talked to his mother and was told that she was going to be arrested that, as soon as he turned, held up the phone, that's when he confessed. Based on this, we ask that the confession be suppressed and on the alternative, this case be remanded for a new trial. Thank you. Thank you, Mr. Smith. I think both of you, your arguments today were about this matter. Under advisement, the bench was arraigned in this position within a short period of time.